IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RYAN MACAULAY,<br><br>Defendant. | Case No. 1:24-cr-180<br><br>The Honorable Patricia T. Giles<br><br>Hearing: September 4, 2025 |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, through its undersigned counsel, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual ("Guidelines" or "U.S.S.G."), hereby submits its position with respect to sentencing of Ryan Macaulay ("the defendant" or "Macaulay"). The defendant comes before the Court for sentencing after pleading guilty to four counts in the 14-count Superseding Indictment without a plea agreement: Count 1, conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349; Count 5, bank fraud, in violation of 18 U.S.C. § 1344; Count 7, conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and Count 11, money laundering unlawful monetary transactions, in violation of 18 U.S.C. § 1957. Presentence Investigation Report ("PSR") ¶¶ 3–5.

The United States agrees with the Probation Officer's calculations of the defendant's Sentencing Guidelines range as set forth in the PSR, giving the defendant a guidelines range of 63 to 78 months of imprisonment. *See* PSR ¶¶ 45–57, 87–88. For the reasons set forth below, the United States respectfully submits that a term of imprisonment within the applicable guideline range would be reasonable and appropriate in consideration of all the factors set forth in 18 U.S.C. § 3553(a).

## I. BACKGROUND

Congress and the Small Business Administration (SBA) designed the Paycheck Protection Program (PPP) for companies adversely impacted by COVID-19, issuing funds to help businesses continue to make payroll to their documented employees. Not long after the government announced the PPP, Raymond Rahbar, Jr. and Ryan Macaulay, cofounders of a fitness center called BYNDfit, concocted a scheme to use their BYNDfit entities, formed to open and operate a fitness facility in downtown Washington, D.C., to defraud the United States and lending institutions of over $3 million in pandemic relief funds. With their plans to open BYNDfit in the spring of 2020 scuttled by pandemic business closures and distancing measures, and Rahbar and Macaulay in an already precarious financial situation with existing creditors, the business owners decided to submit fraudulent PPP applications, complete with fake payrolls listing up to 50-some nonexistent employees and salaries to generate the revenues they convinced themselves they were entitled to. In reality, BYNDfit never opened to the public and never employed nearly the number of people the defendant and Rahbar claimed. PSR ¶¶ 19–24.

To further cover their tracks, the defendant and Rahbar used the fraudulently obtained PPP funds to conduct a variety of financial transactions. Often, after the deposit of PPP funds by a PPP lender, the defendant received checks from the BYNDfit entities which did not represent his salary and would not be issued using BYNDfit's normal payroll processor. The defendant would then deposit these checks in his personal account. PSR ¶¶ 25–27. Additionally, the defendant directed PPP funds to his ex-wife and sister-in-law to make it appear the funds were used for payroll, when in fact those individuals were not salaried employees. The defendant would then direct those family members to return the money via applications such as Venmo so he and Rahbar could use those funds as they pleased. In total, Macaulay was involved in causing over $2.2 million of PPP

funds to be wrongfully disbursed to the BYNDfit entities, companies he cofounded and controlled with Rahbar.

## II.   GUIDELINES CALCULATION

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, it held that a sentencing court must "consult [the] Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); s*ee also United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the [18 U.S.C.] § 3553(a) factors" in determining the appropriate sentence. *Id.* at 49–50; *see also Clark*, 434 F.3d at 685.

### A.   The Base Offense Level and Loss Amount

The base offense level and loss amount enhancement are not in contention. As set out in the PSR, the base offense level is 7, and the total loss amount was more than $1,500,000 but less than $3,500,000, giving the defendant 16 additional points.[1] PSR ¶¶ 47–48.

### B.   Role Enhancement

The Probation Officer is correct in finding that the defendant qualified for a two-level leadership increase under U.S.S.G. § 3B1.1(c), as the defendant and Rahbar served as organizers and leaders of the scheme." PSR ¶ 52. The Government agrees with this enhancement, while the defendant objects. PSR pp. 25–27.

---

[1] The Government does not object to Probation's determination that Macaulay should not be held responsible for the fraudulent loan applications that co-defendant Rahbar submitted for AMC Building Group, American Majestic Construction, or 8533 Georgetown. While these loans were arguably reasonably foreseeable to Macaulay as Macaulay was a salaried employee of AMC Building and American Majestic, and the scheme to defraud for the construction entities was nearly identical to that of the BYNDfit entities (*e.g.*, using the same fake employees and using the funds in the same way for non-authorized expenses funneled through the same accounts), the Government recognizes that the Guidelines does not impute such activity through mere reasonable foreseeability alone.

3

"Under the Guidelines, a district court should apply a two-level upward adjustment in offense level if the defendant was an organizer, leader, manager, or supervisor in criminal activity that did not involve five or more persons or was otherwise not extensive." *United States v. Glass*, No. 22-4057, 2023 WL 2624714, *1 (4th Cir. Mar. 24, 2023) (citing U.S.S.G. § 3B1.1(c)).  In making this determination of the defendant's role in the offense, the sentencing court must consider seven factors: "(1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others." *United States v. Cameron*, 573 F.3d 179, 184 (4th Cir. 2009) (quoting U.S.S.G. § 3B1.1, cmt. n.4).  In the Fourth Circuit, a leadership or organizer enhancement under U.S.S.G. § 3B1.1(c) is appropriate when "the record includes 'proof that the defendant made decisions that reflected his management or supervision of the criminal activities of at least one other person.'" *United States v. Oliver*, 133 F.4th 329, 339 (4th Cir. 2025) (quoting *United States v. Steffen*, 741 F.3d 411, 416 (4th Cir. 2013)).

Contrary to the defendant's contention, the defendant exercised decision-making authority within the BYNDfit company and the fraud scheme.  While it may have been Rahbar's awareness of the PPP that led them to apply for the loans, according to Carl Pierre, the business partner of the defendant and Rahbar, the defendant and Rahbar handled the BYNDfit finances together, and spoke frequently about the company finances and the PPP applications.  The defendant's involvement went beyond technology issues as the CTO; his ex-wife confirmed that the defendant followed Rahbar, tracking the companies' business and finance issues as well.

The defendant participated nearly equally with Rahbar in the commission of the offense,

4

even if they had slightly different roles. Both Macaulay and Rahbar filled out PPP applications and Macaulay spoke to Pierre regarding the fact that he and Rahbar had overstated the number of employees in the PPP applications. Macaulay signed various application documents and even directed his ex-wife to sign various applications.

The defendant brought on his ex-wife, Andrea Macaulay, as a volunteer for BYNDfit, helping to build a website and an app without being paid for her work. In fact, the defendant recruited his wife to become a part owner in one of the BYNDfit entities, BF Chinatown, due to Rahbar's and the defendant's concerns about Rahbar's reputation and Andrea's good credit. Despite this status, Andrea maintained that Rahbar and the defendant ran the business, and Andrea's only relationship with Rahbar was through the defendant. Later, when the PPP began, Andrea maintained that she did not fill out the application documents, but that she only signed what and when the defendant asked her to sign. When she received a $15,000 check from the PPP proceeds, the defendant directed Andrea to give that money *back* to the company. The defendant also recruited Andrea's sister, his sister-in-law, into the scheme, by issuing her PPP funds as well and then asking her to send them back to the company.

The defendant also points out a key fact: he had a personal interest in the business's success; thus, he chose to put the PPP funds he illegally received back into the business in order to try to grow those ill-gotten funds. As a co-owner of the BYNDfit entities, the defendant stood to benefit at least as much as Rahbar, and surely more than Pierre. While he may not have claimed a large amount of the PPP funds for lavish expenditures, he, as an owner, was entitled to a share in line with Rahbar, and far above the 5% ownership stake of Pierre.

From this, it's plain that the nature and scope of the illegal activity—submitting fraudulent PPP applications on behalf of several entities using payroll lists and tax forms made

up whole cloth to the tune of over $2.2 million—and the degree of control and authority exercised over others, including his ex-wife who acted at his full direction, as a C-suite-level executive, co-owner, and partner in handling the business and PPP process with Rahbar, renders a two-point leadership enhancement under § 3B1.1(c) appropriate with the facts in this case.

### C. Acceptance of Responsibility

The United States concurs with the Probation Officer's application of the two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a). PSR ¶ 56.

### III. IMPOSITION OF SENTENCE

Pursuant to 18 U.S.C. § 3553(a), the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to, among other things, reflect the seriousness of the offense and adequately deter criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260–61. The advisory guidelines range is an important starting point because it captures the seriousness of the offense. *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("[T]he Guidelines reflect a carefully considered assessment of the seriousness of federal crimes").

Likewise, "[t]he fact that § 3553(a)[(4)] explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *United States v. Langford*, 516 F.3d 205, 211-12 (3d Cir. 2008) (quotation omitted). Moreover, "the authors of the Guidelines,

no less than district courts, have been tasked with ensuring that criminal sentences meet the goals of sentencing set forth in § 3553(a)," *United States v. Merced*, 603 F.3d 203, 221-22 (3d Cir. 2010), and have prepared "Guidelines that seek to embody the § 3553(a) considerations," *Rita,* 551 U.S. at 347-50. 28 U.S.C. §§ 991(b)(1)(A), 994(f). In general, then, "a within-guidelines range sentence is more likely to be reasonable than one that lies outside the advisory guidelines range[.]" *Goff*, 501 F.3d at 257 (quotation omitted).

Based on these factors, a sentence within the guidelines range of 63 to 78 months imprisonment is appropriate in this case. There is little that is truly mitigating here, beyond that which is already accounted for in the guidelines calculation (particularly the reduction in loss amount), that would warrant a substantial downward variance.

### A.  The Nature, Circumstances, and Seriousness of the Offense

As this Court is aware, the COVID-19 pandemic claimed over one million American lives, and many more world-wide. It disrupted life, for everyone, profoundly. Among other actions to combat the pandemic, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, more commonly known as the "CARES Act." Pub. L. No. 116-136, 134 Stat. 281 (2020). The law sought to alleviate the massive suffering caused by the pandemic and the damage to the economy caused by resulting sudden, widespread lockdowns. The terms of the Act were generous by design: it made billions of government-guaranteed loans available to qualified small businesses through the PPP. The loans would carry the exceptionally low interest rate of 1% if they came due at all. And the loans would be forgiven entirely so long as the proceeds were used for authorized business expenses designed to help struggling companies survive: payroll, utilities, rent, premiums to keep health care benefits in force, and just enough to pay the interest (but not the principal) on a company's pre-existing mortgage or other business loan.

To qualify for a PPP loan, an applicant had to meet certain criteria that were designed to ensure that the program's assets would be used to forestall widespread layoffs and economic collapse. The application for a PPP loan required a business to certify, among other things, that it was "in operation on February 15, 2020 and either had employees for whom [it] paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099-MISC."1 The amount of the loan that could be approved under the program was a function of the applicant's *historical* payroll costs, subject to certain exclusions. Again, the intent of the Act and its implementing regulations were to alleviate widespread economic suffering caused by the pandemic, by giving companies enough money to pay the absolute essentials.

While millions of Americans were struggling, Macaulay and Rahbar were frustrated by the pandemic's impact on their already struggling gym venture. To bolster the cash-strapped project and alleviate the strain from existing creditors, Macaulay and Rahbar plotted to obtain PPP loans by fraud to generate cash flow for a fitness center that had yet to open. Macaulay and Rahbar fabricated payroll reports, generating them by including the names of unwitting family, friends, and Georgetown University students who merely listed their name on a sign-up sheet at a job fair. PSR ¶¶ 30–32. To further paper their fraud, Macaulay and Rahbar concocted false IRS Forms 940 and 941, claiming their businesses had paid thousands in payroll to fictious employees, when, in many instances, the companies had never filed the forms at all. PSR ¶ 23.

Once the banks approved the loans and disbursed the funds, Macaulay and Rahbar engaged in a complicated series of transactions designed to obscure the real use of these funds. To fraudulently spend the loans, Macaulay and Rahbar signed up numerous people, some of whom were not even listed on the fake PPP application payroll, as employees using a payroll processor. Macaulay and Rahbar then caused the payroll processor to send the PPP money to their friends

8

and family, many of whom were not even expecting any money at all. To get these funds back to keep the business idea afloat, Rahbar and Macaulay asked these individuals to send most of that money back to BYNDfit so they could spend the money on unauthorized purchases. PSR ¶ 31.

### B. The Defendant's History and Characteristics and the Need for Specific Deterrence

The history and characteristics of the defendant support a meaningful carceral sentence. Although the defendant has no scored criminal history, the scope of this conspiracy, the number of fraudulent loans at issue, the leading role the defendant played in the scheme, all suggest he needs to receive a substantial jail sentence to drive home the message that these sorts of crimes do not pay. The defendant's fraud was calculated and repetitive, and he and Rahbar had multiple opportunities to stop their criminal conduct, yet they persisted. The scope and volume of the scheme led by the defendant and Rahbar using numerous business entities to defraud illustrate how their criminal conduct became seen as a normal source of income for their failing gym, themselves, and their friends. The defendant further inculpated his ex-wife and his sister-in-law, setting up his ex-wife as an on-paper owner of a company, directing her to sign PPP loans for a BYNDfit entity, sending her PPP money, and then instructing her to funnel the money back to the business. Indeed, the Sentencing Commission noted in its "background" commentary to § 3B1.1 that the upward adjustment for leadership, in part, is based on the view that persons who organize and lead extensive criminal conduct involving multiple individuals inherently pose a higher risk of recidivism. For those reasons, a significant jail sentence is necessary for this defendant to understand the nature of his role in this scheme and the culpability he shares for these offenses.

### C. Need to Deter Future Criminal Conduct and Promote Respect for the Law

A significant, but not excessive sentence, is also called for in this case to promote general deterrence. Absent a meaningful term of imprisonment, general deterrence—"the effort to

discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). The Court must also consider how to deter others as a general matter from engaging in similar conduct. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized.").

They are therefore more susceptible to general deterrence and more in need of a significant sentence to achieve that deterrence. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted). Moreover, crimes like this are lucrative and can be difficult to detect. As here, the defendant and his coconspirators use a vast series of payment methods to disburse the PPP funds (checks, payroll processor), and then a vast series of methods to recoup that money (having recipients pay back funds via Venmo and other means), and then yet another series of bank accounts to move the money between entities and individuals. *See, e.g., United States v. Hefferman*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."). And until the end, the defendant and Rahbar maintained that their method of counting employees and expenditures were all lawful in the name of trying to save BYNDfit. In reality, all these actions were criminal. A significant sentence is, therefore, necessary to send the appropriate message to this defendant— and more importantly, to all those that may seek to abuse government-funded assistance

10

programs—that those who engage in this conduct will be caught and punished significantly.

### D. Avoid Unwarranted Sentencing Disparities

As the Seventh Circuit has noted, "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (noting light sentence for cooperating defendant was appropriate and lengthy sentence for defendant who did not was appropriate, and was not a disparity, but a justifiable difference); *see also United States v. Matthews*, 701 F.3d 1199, 1205 (7th Cir. 2012) (*quoting United States v. Smith*, 510 F.3d 603, 610 (6th Cir.2010)) ("To find an unwarranted disparity in this case would allow defendants to bind district courts according to the most lenient sentence that another court had imposed for a similar crime.")."

The defendant's codefendant, Rahbar, has yet to be sentenced.  The other coconspirator, Pierre, had exposure far more limited than the defendant, pleading guilty to only one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349.  As a result, Pierre's sentence of one day incarceration and three years of supervised release is inapposite.  *See United States v. Pierre*, 1:24-cr-173 (Dkt. Nos. 23, 24).

Looking to similar PPP fraud cases in this district is thus instructive.  In *United States v. Sadie Mitchell*, the case most analogous to the instant matter, the defendant Sadie Mitchell and a co-conspirator devised and executed a scheme to defraud the PPP and EIDL programs, as well as unemployment benefits.  The defendant submitted five PPP applications to a financial institution, each containing false statements, false representations, or false certifications.  For instance, these applications contained false and fabricated gross figures and false certifications that the businesses were in operation on February 15, 2020.  The defendant further executed a scheme to defraud the

11

EIDL program, which was intended to give forgivable loans to small businesses. Mitchell submitted several fraudulent EIDL applications to the SBA for businesses that had no customers, employees, or business activity, and in those applications, she made false statements, representations, and false certifications. All told, the defendant stole over $1.2 million in pandemic relief. With guidelines of 78 to 97 months of imprisonment (total offense level of 26, criminal history category III), defendant Mitchell received a sentence of 70 months imprisonment and five years of supervised release. Case No. 3:22-cr-44 (E.D. Va. Richmond). Here, a guidelines sentence for defendant Macaulay would ensure parity and avoid unwarranted sentencing disparity amongst similar schemes.

## IV.  CONCLUSION

Based on the 18 U.S.C. § 3553(a) factors, a guideline sentence of 63 to 78 months, as well as orders of restitution and forfeiture, and a three-year term of supervised release, are necessary and entirely appropriate in this case.

Respectfully submitted,

Erik S. Siebert
United States Attorney

By:   /s/
Kristin S. Starr
Christopher J. Hood
Avi Panth
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 838-2638
Facsimile: (703) 299-3980
Email: Kristin.Starr@usdoj.gov

## **CERTIFICATE OF SERVICE**

      I hereby certify that on August 29, 2025, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record.

                                                    /s/
                                      Kristin S. Starr
                                      Assistant United States Attorney
                                      United States Attorney's Office
                                      Eastern District of Virginia
                                      2100 Jamieson Avenue
                                      Alexandria, VA 22314
                                      Telephone: (703) 838-2638
                                      Facsimile: (703) 299-3980
                                      Email: Kristin.Starr@usdoj.gov