## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

United States of America

v.

Ryan Macaulay

Case No. 1:24-CR-00180-002

Hon. Patricia Tolliver Giles

---

### RYAN MACAULAY'S POSITION ON SENTENCING

Ryan Macaulay, by undersigned counsel, respectfully asks the Court to impose a sentence of twelve months and one day of incarceration for the crimes to which he has pleaded guilty without the benefit of a plea agreement, including one count each of Conspiracy to Commit Bank Fraud (18 U.S.C. § 1349), Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h)), Bank Fraud (18 U.S.C. § 1344), and Money Laundering (18 U.S.C. § 1957). Under the circumstances of this case, and for Mr. Macaulay individually and in the context of other similarly situated defendants, a sentence of twelve months and one day is sufficient, but not greater than necessary, to meet the purposes of sentencing Mr. Macaulay for his only criminal involvement.

## I.    FACTUAL BACKGROUND

Mr. Macaulay accepts responsibility for the facts outlined in the Superseding Indictment (ECF 38) and the Statement of Facts (ECF 114). He fully owns and accepts his role in this criminal conduct—he falsified documents exaggerating the numbers of employees and their payroll expenses, he allowed one loan application he

knew to be fraudulent to be signed in his name, he entered into an agreement with Mr. Rahbar and Mr. Pierre to undertake this fraud, and he accepted payments from the PPP loans and redeposited those funds back into BYNDfit. Mr. Macaulay has pleaded guilty without the benefit of a plea agreement—to all four charges he faced— and he is prepared to accept the consequences of his actions, but his role in the offense must be understood to be substantially lesser than Mr. Rahbar's and more in line with Mr. Pierre's, and he should be sentenced accordingly. Because he pleaded guilty without the benefit of a plea agreement, there is no agreement as to the applicable sentencing guidelines.

## II.    SENTENCING GUIDELINES

By the Presentence Investigation Report (ECF 123) (hereinafter "PSR"), the Probation Office has calculated Mr. Macaulay's Total Offense Level at Level 26. PSR at 12, ¶ 57. Mr. Macaulay objects to three of the sentencing enhancements in the PSR, specifically, the two-level enhancement for role in the offense, under U.S.S.G. §3B1.1(a); the two-level enhancement for deriving more than $1,000,000 in gross receipts, under U.S.S.G. § 2B1(b)(17)(a); and the 16-level enhancement for loss amount greater than $1,500,000 but less than $3,500,000, under U.S.S.G. § 2B1.1(b)(1)(I), which the defense submits should be a 14-level increase based on the properly calculated loss amount after removing legitimate expenditures. *See PSR* at 11 ¶ 48, 12 ¶¶ 49, 52, and 22-6.

**A.     Role Enhancement is not Warranted Because Mr. Macaulay Did Not Exercise Control Over Carl Pierre or any Other Participant**

Mr. Macaulay respectfully disagrees with the PSR's application of a two-level enhancement for his role in the offense. PSR ¶¶ 42, 52. In determining whether to apply the Aggravating Role enhancement under U.S.S.G. § 3B1.1, a sentencing court must look to the following factors: decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the illegal activity, and the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, cmt. n. 4; *see also*,

While it is accurate that Mr. Macaulay was a co-founder with Mr. Rahbar, so too was Mr. Pierre, who did not receive the two-level enhancement as a leader. Government Position on Sentencing (Pierre) at 3-4. All evidence in the case points to Mr. Rahbar as the sole leader and director of the conspiracy. Every witness who spoke with the FBI or testified before a grand jury advised that it was Rahbar who directed them to provide information used to prepare the fraudulent loan applications. The Government seeks to paint Mr. Macaulay as joined in lockstep with Mr. Rahbar— and that may very well be their theory of the offense had the case proceeded to trial— but that is not what the evidence proves. What is clear is that Mr. Rahbar drove the conspiracy from the beginning. As the C.E.O. and the only participant with substantial business management experience—Mr. Rahbar brought Mr. Macaulay and Mr. Pierre into BYNDfit but retained majority ownership and decision-making authority. It was Mr. Rahbar who created the multiple BYNDfit entities and who

subcontracted his own construction companies to build out the fitness hall. And Mr. Rahbar himself directed Mr. Macaulay and Mr. Pierre to produce documents and sign forms to obtain the fraudulent PPP loans.

There were only three co-conspirators in the scheme, Mr. Pierre, Mr. Rahbar, and Mr. Macaulay. Contrary to the Government's assertions in response to the defense PSR objections, at no time did Mr. Pierre advise investigators that Mr. Macaulay directed him to undertake any criminal activity. To the contrary, Mr. Pierre in multiple statements to law enforcement, advised that it was Mr. Rahbar who directed both him and Mr. Macaulay to provide inflated employee numbers and to sign fraudulent documents. Any direction in the conspiracy came from Mr. Rahbar. Mr. Macaulay participated but did not direct others within the conspiracy. Mr. Macaulay did not recruit anyone into the conspiracy and handled almost none of the hiring for BYNDfit

Further, as the Government's charges and discovery materials make clear, no one beyond the core three members of the conspiracy even participated in the fraudulent conduct. The Government, in its response to the defense objections and corrections to the initial PSR, argues that "Macauley [*sic*] exercised decision-making authority in BYNDfit and was described as the chief deputy or CTO [Chief Technical Officer] at the company." PSR at 25. The defense agrees with that statement, but it does not make Mr. Macaulay a director, organizer, or manager *of the conspiracy to defraud*.

An enhancement under U.S.S.G. § 3B1.1(b) is appropriate when "the record includes 'proof that the defendant made decisions that reflected his management or supervision of the criminal activities of at least one other person." *United States v. Oliver*, 133 F.4th 329, 339 (4th Cir. 2025) (quoting *United States v. Steffen*, 741 F.3d 411, 416 (4th Cir. 2013)) (upholding the enhancement where there was evidence in the record that defendant organized a robbery, recruited a participant, and provided him with a gun). Under § 3B1.1., there must be evidence that the defendant actively exercised some authority over other participants in the criminal enterprise. *United States v. Slade*, 631 F.3d 185, 190 (4th Cir. 2011). Fourth Circuit cases interpreting the leadership enhancement hinge on whether the defendant "exercised any supervisory responsibility" over others in the conspiracy. *Id*. In *Slade*, for example, a drug distribution conspiracy in which the defendant was a mid-level manager and distributor to street-level dealers within the organization, the Fourth Circuit found that he did not control these lower-level dealers or direct them in terms of their sales. *Id.* The requirement is that a defendant be a manager or leader in the conspiracy as evidenced by directing one or more participants *in that conspiracy*. Mr. Macaulay was an executive in BYNDfit, as was Carl Pierre, but he did not direct Mr. Pierre in the conspiracy. Raymond Rahbar directed them both.

The Government argued that Mr. Macaulay recruited his wife, Ms. Macaulay, into the conspiracy. But Ms. Macaulay was never a *member* of the conspiracy or a "participant" in criminal activity, as evidenced by her receipt of a witness letter

rather than a target letter from the Government, her statements to law enforcement and before the grand jury, and the fact that she was never charged with the offense.

The Advisory Notes to U.S.S.G. § 3B1.1 define a "participant" as "a person who is criminally responsible for the commission of the offense, but who need not have been convicted. A person who is not criminally responsible for the commission of the offense … is not a participant." U.S.S.G. § 3B1.1 cmt. n. 1. While the defense concedes as it must that an unindicted coconspirator can be a participant in the conspiracy for purposes of the offense role enhancement, such was not the case with Ms. Macaulay based on evidence in discovery, including her grand jury testimony and statement to law enforcement. Mr. Macaulay thus cannot be ascribed an aggravating role for leadership for having asked his wife to sign a document she did not know was fraudulent. And as Ms. Macaulay's own statements support, it was Mr. Rahbar who directed Mr. Macaulay to have Ms. Macaulay sign the document. Accordingly, Mr. Macaulay should not receive the two-level enhancement for his role in the offense.

## B.  Mr. Macaulay Did Not Receive More Than $1,000,000 in Gross Receipts as He Did Not Have a Controlling Stake in BYNDfit and Did Not Receive More Than $1,000,000 Himself

The PSR ascribes Mr. Macaulay at two-level enhancement for deriving more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, pursuant to U.S.S.G. § 2B1.1(b)(17)(A). But the Guidelines do not support the PSR's finding. U.S.S.G. § 2B1.1 cmt. n. 13(A) provides that "for purposes of subsection (b)(17)(A), the defendant shall be considered to have derived more than

$1,000,000 in gross receipts if the gross receipts to the defendant *individually*, rather than to all participants, exceeded $1,000,000." (emphasis added). Mr. Macaulay is not alleged to have received anywhere close to $1,000,000 in proceeds from the fraudulent loans.[1]

The Fourth Circuit has interpreted the gross receipts enhancement under U.S.S.G. § 3B1.1(b)(17)(A) in accordance with the Guidelines commentary to require that a defendant individually received more than $1,000,000 in proceeds of the fraud to qualify for the enhancement. *United States v. Colton*, 231 F.3d 890, 911 (4th Cir. 2000). In the case of individuals such as Mr. Macaulay who have been convicted of obtaining funds for a corporate entity, the Fourth Circuit has held that an individual is only individually responsible for corporate funds if he has a controlling stake in the corporation. *Id.* Mr. Macaulay was at most a 35% stakeholder in BYNDfit and had no ownership interest in any of the construction entities. Thus, he cannot appropriately be held responsible to receive the § 3B1.1(b)(17)(A) enhancement for gross proceeds over $1,000,000.

## C.    The Loss Amount Attributable to Mr. Macaulay is Under $1,500,000

Because this case involves fraud in obtaining government benefits, i.e., exaggerated and fraudulent PPP loans, for Guidelines purposes, the loss amount

---

[1] The government has advised it intends to seek restitution in the amount of $185,245 from Mr. Macaulay for money that was paid from the PPP loans to himself, his wife, and to his wife's sister. Mr. Macaulay will separately challenge that estimate in response to a motion for restitution.

attributable to Mr. Macaulay must be offset by any loan proceeds used for legitimate purposes such as actual payroll expenses and other business expenditures authorized under the benefit program, here the Paycheck Protection Program. U.S.S.G. § 2B1.1(b)(1), cmt. N.3 (F)(ii). Such expenses include payroll costs, employee salaries, commissions, or similar compensations, payments on mortgage obligations, rent, utilities, interest on debt obligations, covered operations expenditures, property damage costs, supplier costs, and worker protection expenditures. 15 U.S.C. §§ 636(a), 636m(b). PPP loans could be used for certain expenses, such as payroll costs, mortgage or rent payments, and utility payments. *See* 15 U.S.C. §§ 636(a)(36)(F)(i), 636(a)(36)(E). Other uses were prohibited, and Mr. Macaulay does not dispute that they used funds well beyond what was authorized. But that does not negate that a substantial portion of the PPP loan proceeds were used for legitimate expenses and purposes. Those legitimate expenses are properly removed from the loss amount calculation.

The Guidelines and Fourth Circuit precedent provide that the amount of loss must be considered "as the difference between the amount of benefits [a defendant] actually received and the amount he would have received had he truthfully and accurately completed the . . . forms." *United States v. Conner*, 456 Fed. Appx. 300, 307 (4th Cir. 2011) (quoting *United States v. Dawkins*, 202 F.3d 711, 715 (4th Cir. 2000)). "In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be calculated to be not less than the value of the benefits

obtained by unintended recipients or diverted to unintended uses." U.S.S.G. § 2B1.1(b)(1), cmt. n.3 (F)(ii).

Here, where BYNDfit employed and paid actual employees and for legitimate business expenses from proceeds of the PPP loans, those expenses must be subtracted from the loss amount. The PPP provided loans to maintain employment, both by paying current employees during the pandemic and to maintain businesses so they could withstand the lockdowns and continue to employ people after they were over. Mr. Macaulay and his co-conspirators overstated the numbers of employees they had on staff at BYNDfit. This is not disputed. But they did have legitimate employees who entitled them to portions of the loans they received.

Legitimate payroll expenses for employees of BYNDfit other than Pierre, Rahbar, and Macaulay total approximately $400,000 based on review of interview statements and grand jury testimony.[2] Pierre, Macaulay, and Rahbar also received salary payments for work they actually completed for BYNDfit, though Macaulay returned all of his receipts back into the BYNDfit accounts to try to keep the company afloat through the pandemic.

BYNDfit likewise paid rent during the pandemic, appropriately using funds attributable to the PPP loans. While the terms of the lease did not require rent

---

[2] This number is not precisely knowable from records available to Mr. Macaulay in discovery, but many employees reported receiving payments during the pandemic, several receiving nearly $100,000 for work they completed on behalf of BYNDfit while they were trying to get the business up and running.

payments to the fitness hall's landlord, and while D.C. was shut down during the pandemic, Mr. Rahbar moved the corporate headquarters to 8533 Georgetown Pike, in Mclean, Virginia, a home he inherited from his father and which he owned in a corporate entity named for the property's address. For use of this space, Mr. Rahbar paid his LLC rent using PPP money for BYNDfit. Rahbar paid below-market rent totaling approximately $130,000.00 and actually used the space as a business headquarters. Mr. Macaulay did not have an ownership interest in 8533 Georgetown Pike and thus did not receive any of the rental income, nor did he make the decision to pay the rent from BYNDfit funds. Mr. Macaulay accepted Mr. Rahbar's representation that this was a legitimate use of PPP loan funds, though he accepts responsibility for obtaining these loans fraudulently. Office rental expenses are legitimate business expenses under 15 U.S.C. § 636(a)(36)(E), so the payments are appropriately subtracted from the Total Loss Amount, at least as attributable to Mr. Macaulay.

Additionally, the PSR errs at ¶ 35 in holding Mr. Macaulay responsible for the $2,231,929.00 combined Total Actual Loss of $1,959,013.00, calculated at ¶ 33, and Total Intended Loss of $272,916.00, as provided at ¶ 34. PSR ¶ 35. Pursuant to U.S.S.G. Application Note 3(A) to U.S.S.G. § 2B1.1(b)(1), the loss amount is properly calculated as "the greater of actual loss *or* intended loss" *Id.* (emphasis added). As such, if no funds had been used for legitimate business expenses, the total loss would would be properly calculated at $1,959,013.00.

With the reduction in loss amount required by U.S.S.G. § 2B1.1(b)(1), cmt. N.3 (F)(ii), Mr. Macaulay's total loss amount should be $1,959,013.00 reduced by the amount of legitimate expenditures or roughly $530,000, for an actual loss amount attributable to Mr. Macaulay for purposes of sentencing of approximately $1,429,014.00, resulting in a 14-level enhancement under § 2B1.1(H).

**D.    Mr. Macaulay's Sentencing Guidelines Should Be Level 20**

Without the enhancements Mr. Macaulay's Guidelines are properly calculated as follows:

- A Base Offense Level of 7, pursuant to USSG §§ 2X1.1(a) and 2B1.1(a)(1).

- Specific Offense Characteristics: Loss amount exceeds $6,500, and more than $550,000, but less than $1,500,000. Pursuant to USSG § 2B1.1(b)(1)(H), this results in a 14-level enhancement.

- Specific Offense Characteristics: The PSR adds a 1-level enhancement pursuant to USSG § 2S1.1(b)(2)(A) because Mr. Macaulay was convicted under 18 U.S.C. § 1957. PSR ¶ 50. Mr. Macaulay does not dispute this enhancement.

- Acceptance of Responsibility: The PSR correctly reduces Mr. Macaulay's Guidelines range by 2 levels for his acceptance of responsibility.[3]

---

[3] Mr. Macaulay has no ability to seek the additional one-point reduction for acceptance of responsibility that the government has sole discretion to authorize, though, in fairness, he hopes to receive it as he pleaded guilty and saved the government the expense of a trial.

- Total Offense Level: The PSR calculates Mr. Macaulay as having a Total Offense Level 26. Mr. Macaulay submits a Total Offense Level 22 is appropriate, before a two-point reduction under 821 because Mr. Macaulay is a zero-point offender who would otherwise be disqualified from the reduction but for the erroneous leadership role enhancement.

- Criminal History Score is zero, as Mr. Macaulay has no prior convictions, resulting in a Criminal History Category I.

**E.    Mr. Macaulay Should Receive a Two-Level Reduction as a Zero-Point Offender Pursuant to U.S.S.G. § 4C1.1.**

The United States Sentencing Commission ("U.S.S.C.") added Section 4C1.1, which provides for a two-level downward adjustment for certain zero-point offenders. Because Mr. Macaulay is a zero-point offender, if the Court accepts that he was not a leader or organizer of the conspiracy, he should receive a two-point reduction under U.S.S.G. § 4C1.1. Under § 4C1.1(a), Mr. Macaulay satisfies all the requirements. Pursuant to the argument regarding his role in the offense, above, § 4C1.1(a)(10) would not preclude Mr. Macaulay from properly receiving the two-level reduction. Accordingly, he should receive the reduction as a zero-point offender. U.S.S.G. § 4C1.1; *see also United States v. Williams*, 130 F.4th 177, 186 (4th Cir. 2025) (outlining the process by which a zero-point offender receives a two-point reduction).

After the appropriate reduction, Mr. Macaulay submits that his total offense level is 20.

## III.    18 U.S.C. § 3553(A) FACTORS

The sentencing court's duty is to consider all the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. The sentence imposed must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C.§ 3553(a)(2). Additionally, § 3553 requires the sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s). 18 U.S.C. § 3553(a)(1)-(7).

Pursuant to § 3553, the advisory Guideline range receives no presumption of reasonableness, nor does a sentence that varies from the Guidelines receive any presumption of unreasonableness. *See Gall v. United States*, 522 U.S. 38, 50 (2007). We submit that a sentence of 12 months is appropriate upon consideration of the § 3553(a) factors.

A.      **The Nature and Circumstances of the Offense**

The Statement of Facts and Offense Conduct portion of the PSR largely address the nature and circumstances of the offense. To determine a proper punishment, however, Mr. Macaulay asks the Court to consider the additional information below, not to diminish his responsibility, but to provide necessary context to allow the Court to impose an individualized sentence under the specific facts of this case.

Ryan Macaulay believed BYNDfit would be a great success. He invested his life savings in the business concept he and Mr. Rahbar developed and worked around the clock doing technical and physical labor to lower costs in building out the space. He trusted his close friend and business partner, Raymond Rahbar, BYNDfit's Chief Executive Officer—a tax attorney and established business man—to handle finances, negotiate leases and construction contracts, and to manage the business operations of their enterprise.

BYNDfit was to be a state-of-the-art fitness hall in Washington, D.C., that would offer high-end classes in a luxurious setting. BYNDfit was—in the words of one of its co-founders—supposed to be a first of its kind, revolutionary gym that used technology to make it flexible and adaptable to any future workout trends.[4] It was a promising and potentially transformative enterprise until its scheduled opening

---

[4] This description comes from statements made by Carl Pierre.

coincided with the onset of the COVID-19 pandemic and resultant lockdowns in the Spring of 2020.

Beginning in 2018, Ryan Macaulay and his partners, Carl Pierre and Raymond Rahbar, began putting the luxury fitness hall concept into action. They leased space, built out facilities, hired employees, and prepared to open BYNDfit in March of 2020 with a core group of employees, including Director of Group Fitness, Jordan Ciminelli; Andrew Hamm, the carpenter employed to complete high-end trims in the facility; Director of Performance, Michael Rosengart; Director of Corporate Partnership, Molly Shearer; Director of HIIT (High Intensity Interval Training), Kaitlyn Wozniak; Director of Yoga, Mimi Riegar; Nutritionist/Dietician Alyssa Medlin in charge of the juice bar/restaurant; and Andrea Macaulay, who provided website and other computer services to the company. Further, co-founders Raymond Rahbar, Carl Pierre, and Mr. Macaulay were legitimate working employees of BYNDfit who received salaries for their work. Additionally, BYNDfit had hired—though they had yet to start working before the space opened to the public—numerous other employees—trainers, fitness instructors, and marketing staff—to ensure they would be adequately staffed upon opening.

But Washington, D.C. shut down in March of 2020 in response to the COVID-19 pandemic. The lockdowns extended through 2021, and the gym never opened. But during much of 2019 and 2020, and into 2021, employees continued to work or maintained their availability to work upon opening, and BYNDfit continued to pay

them for using funds obtained through a series of Paycheck Protection Program ("PPP") loans. The core employees worked to get BYNDfit open for business and were paid from PPP loan proceeds for work that they actually performed for the company for at least a portion of 2019 and 2020.

As Mr. Macaulay has acknowledged by pleading guilty and signing the Statement of Facts (ECF 114), the co-conspirators inflated numbers of employees and payroll amounts and submitted false documents to obtain PPP loans for BYNDfit.[5] While Mr. Macaulay's goal was always to maintain staff and facilities so they could open when the pandemic finally ended, he accepts that he crossed the line and participated in the conspiracy with Mr. Rahbar and Mr. Pierre to fraudulently obtain loans and use the proceeds for unauthorized expenses. But he did not use the funds for personal expenses, and he did not use the funds to fuel a lavish lifestyle. This was always a business Mr. Macaulay hoped—perhaps unreasonably after a point—would be viable, succeed, turn profit, and employee dozens of people. He has pleaded guilty to the crimes with which he was charged and accepts responsibility for his actions.

---

[5] Mr. Rahbar also submitted PPP loan applications for business he operated apart from Mr. Macaulay, described as the "construction entities" throughout. Mr. Macaulay received payments from those loans for work he performed for those entities, which were in some cases contracted by BYNDfit, but he had no access or knowledge of the construction entities' finances, bank accounts, or tax filings, nor was he a member, director, or executive of those entities. The PSR and Government agree that Mr. Macaulay cannot be held liable for the losses of the construction entities.

B.    **History and Characteristics of Ryan Macaulay**

The Court must consider Mr. Macaulay's conduct in committing these offenses against the backdrop of his life and the strength of character he has previously demonstrated through service to his country, his family, his employers, and his co-workers.

As evident in the letters of support attached as **Exhibits 2-5** to this Memorandum, Mr. Macaulay is loved, respected, and depended upon by his family. Mr. Macaulay's mother and brother have detailed the support and love he has provided them through difficult times. Mr. Macaulay's mother recently underwent cardiac surgery and is recovering at home with his assistance. Her recovery is expected to take several more months, and he hopes to be there as her only caregiver. Mr. Macaulay's brother, while supportive, does not have the use of his legs and thus cannot provide the care their mother currently requires.

As described by his mother, Mr. Macaulay was raised without his father in his life. His mother worked hard and provided a good life for him and his brother. But the lack of a father affected him and left him without someone to speak with about some of the challenges he faced as a teenager, particularly when the family moved to a new community and he changed school districts between elementary and middle school. Mr. Macaulay's brother, eleven years his senior, was living on his own by this time. Mr. Macaulay found it difficult to adjust to the new peers, and he struggled to make friends or fit in and had no male role model at home to speak with. Mr.

Macaulay developed a good relationship with a teacher at his school who has since passed away, and he ascribes great value to that relationship in helping him through a difficult period in his life.

Mr. Macaulay went on from high school to enter the workforce and has worked diligently all his life. The performance evaluations from his past and current employers attached as **Exhibits 6 and 7** attest to his exceptional dedication to work, his drive, and his support of co-workers and employer goals. While Mr. Macaulay could not obtain performance evaluations from his work at the State Department, he submits they are similarly glowing, as evidenced by the Assistant Secretary's Award for Excellence he received in 2014, attached as **Exhibit 8**.

As evident in his letter to the Court, attached as **Exhibit 1**, Mr. Macaulay is deeply remorseful for his actions and the harm he has caused. He is particularly regretful for having harmed the government to which he spent much of his career in service. He will appear before the Court on September 4th, humbled and remorseful for his actions. Mr. Macaulay's letter makes clear his deep remorse, his pride in his family and his career, his love of his country and shame at having caused this harm. And he looks forward to his opportunity to speak to the Court at sentencing.

Mr. Macaulay took illegal advantage of the government's pandemic relief funds that were presented as a safety valve in a time of great fear and uncertainty. He did so following the lead of a man he looked up to, who was more experienced in business and finance, and whom he trusted. Mr. Macaulay saw Raymond Rahbar as a role

model in business, someone who had built himself up from humble roots and had real success in business. Mr. Macaulay's life and background shed some light on why and how he was misguided in following Mr. Rahbar's lead and looking to him for mentorship, but he does not seek to blame anyone else for his actions. Mr. Macaulay is responsible for the choices he has made, including those that bring him before this Court to be sentenced.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

Any prison sentence is a severe punishment, particularly so for someone who has never committed a crime or spent a day behind bars. The daily reality of sharing a locked cell with another man is hard to contemplate for a person who has never lived in such conditions. Two men share a room averaging 80-100 square feet with two beds, a combinations toilet and sink, and maybe a single small desk. There is no privacy, no quiet, and no ability to control when the lights are turned on and off. A 12-month sentence is a substantial period of time for a person to spend without the freedoms we can take for granted in our lives. For Mr. Macaulay, 12 months in prison will serve to adequately but not excessively punish him, giving him time to further reflect on his conduct—to do his penitence—and allow him to return to society to live the lessons he has learned.

Mr. Macaulay acknowledges that he has committed serious offenses and that he must suffer the consequences of his actions. A sentence of 12 months incarceration

would punish him sufficiently for his conduct. As outlined in the disparity analysis below, a 12-month sentence will provide just punishment for Mr. Macaulay's crimes when considered against other sentences recently imposed in similar cases and when balanced against the other factors the Court must consider.

**D.    The Need to Afford Deterrence to Criminal Conduct and Protect the Public from Future Crimes of the Defendant**

Mr. Macaulay is a 36-year-old man with no criminal history, convicted of an economic crime, who has strong ties to the community, and family support. As such, he represents a statistically low risk of recidivism based on social science research by the U.S. Sentencing Commission. That Mr. Macaulay has no criminal history is among the strongest predictors that he will not recidivate.[6] The U.S. Sentencing Commission finds that rearrest rates are 30.2% for offenders with zero total criminal history points like Mr. Macaulay, and range up to 80.1% for offenders in the highest criminal history category.[7] That he has been convicted of an economic crime also strongly correlates with a low risk of recidivism.[8] General statistical rates combined with Mr. Macaulay's history and personal characteristics create strong evidence that

---

[6] *See* U.S.S.C., The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders, at 7-8 (2017) (listing recidivism rates by criminal history category and finding Category I offenders to be dramatically less likely to reoffend than those with criminal history points). Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf 20170309_Recidivism-CH.pdf.

[7] *See* U.S.S.C., Recidivism Among Federal Offenders: A Comprehensive Overview, at 5 (2016). Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf

[8] *Id.* at 11 (finding defendants convicted of economic crimes to be in the lowest category for recidivism among all offenders).

he will not reoffend and further support a substantial variance from the advisory guideline range. *See*, e.g., *United States v. Smith*, 2008 WL 1816564 *4 (4th Cir. 2008) (affirming downward variance based in part on the defendant's "exemplary life" and lack of criminal history).

## E.    The Need to Avoid Unwarranted Sentencing Disparity

A review of sentences imposed in the Eastern District of Virginia in recent PPP loan fraud cases shows that a sentence of 12 months and a day would be consistent with other offenders with similar characteristics and similar criminal conduct.[9] In the majority of the cases reviewed, defendants had created shell companies or false businesses solely to take advantage of pandemic relief funds. In only a relatively few cases did the conduct involve individuals who obtained loans for actual businesses but inflated numbers of employees and falsified documents as in the facts of Mr. Macaulay's case. The distinction is meaningful between an individual like Mr. Macaulay who obtained fraudulent loans attempting to carry his business through the pandemic and those individuals who obtained those loans to fund lavish lifestyles and personally enrich themselves. The following Eastern District of Virginia, Alexandria Division cases illustrate this distinction:

<u>United States v. Kindambu</u> (1:20-CR-260) and <u>United States v. Nsahlai</u> (1:21-CR-234)

---

[9] A Comparable Case Table is attached as **Exhibit 9.**

Didier Kindambu and Rose-Marie Nsahlai took advantage of the COVID-19 pandemic to create shell companies—with no employees—the coconspirators used solely for the purpose of obtaining multiple PPP loans they used to purchase luxury goods for themselves. *See*, Government's Position on Sentencing for Didier Kindambu, E.D. Va. Case No. 1:20-CR-260, ECF 55. Upon receiving and depositing $2.5 million into Kindambu's accounts, they then completed and signed promissory notes on behalf of both shell companies based on the same false statements used to obtain the PPP loans, thus effectively doubling their fraud. *Id.* Mr. Kindambu used these funds to "buy himself a brand-new Lexus and a brand-new Cessna aircraft, to pay for part of a 6-bedroom, 7,000 square-foot home priced at over $1.1 million, …, to pay his personal tax bill, and to purchase luxury items for himself from Gucci, Nordstrom, Hugo Boss, Winn Bros, and Lenkersdorfer Fine Jewelry." *Id.* at 6.

While Mr. Kindambu pleaded guilty, Ms. Nsahlai proceeded to trial and was convicted, based in part on an email in which she admitted that she had devised the plan to defraud the government for the purpose of enriching herself and Mr. Kindambu. *See* Governments Position on Sentencing, *United States v. Nsahlai*, Case No. 1:21-CR-234 (E.D. Va. 2021), ECF 160. That she proceeded to trial despite that email indicates her unwillingness to accept responsibility for her actions. She received a sentence of 33 months on an offense level of 30 (97-121 months). Mr. Kindambu's offense level was 22, as agreed by a plea agreement, and he received a sentence of 30 months, after a reduction from a range of 41-51 months based on

U.S.S.G. § 5K1.1. For both Kindambu and Nsahlai, the Government described their offenses as "crimes of choice" and argued that they exploited the pandemic for personal gains and to personally enrich themselves.

The contrast with Mr. Macaulay's case is stark. Mr. Macaulay kept none of the proceeds of the loans, placing it all back in the BYNDfit entities, including the funds he received as salary for his work both for BYNDfit and the construction entities. Mr. Macaulay purchased nothing for himself from these PPP loans.[10] His loss amount is substantially less than for Kindambu and Nsahlai, and he committed no additional criminal offenses outside the PPP loan fraud conspiracy. Even if his Guidelines were properly calculated at 63-78 months, which he submits as above they are not, a sentence of 18-24 months would be in line with Nsahlai and Kindambu.

### *United States v. Magee* (1:23-CR-91) and *United States v. Gilcher* (1:23-CR-86)

Bennie Magee and Michael Gilcher operated a fraud scheme in which they obtained PPP loans to fund a cryptocurrency business. Magee devised the scheme roughly one month into the COVID-19 pandemic, and Gilcher went along, seeing the loans as "easy money" for themselves and Magee's cryptocurrency mining business. *See* Government's Position on Sentencing, *U.S. v. Michael Gilcher*, at 3. As with Mr. Rahbar and Mr. Macaulay, "Magee committed most of the overt acts to execute the fraud scheme" and Gilcher "knowingly assisted Magee in applying for the pandemic

---

[10] Carl Pierre told investigators Mr. Macaulay purchased an Audi automobile during the relevant time period, but Mr. Macaulay's car was financed based on his and his wife's salaries with their other full-time jobs.

*United States v. Ryan Macaulay*, 1:24-CR-00180-PTG
*Memorandum in Aid of Sentencing*

relief loans." *Id.* The total loss amounts for the schemes were calculated at $7.6 million for Magee and $1.4 million for Gilcher.

Mr. Magee's presentence report assigned a total offense level of 32, including a four-level enhancement for role in the offense, a two-level enhancement for $1 million or more in gross receipts, a two-level enhancement for use of sophisticated means, and a two-level enhancement for obstruction of justice. *See* Government's Position on Sentencing (Magee) at 3-7. Mr. Magee ultimately received a two-level reduction for acceptance of responsibility based on the terms of his plea agreement, although the Probation Office calculated that he was not entitled to the reduction based on his obstruction of justice. *Id* at 8. Magee was sentenced to a term of 60 months on guidelines the Court found appropriately calculated at level 32, which would correspond to a sentence of 121 to 151 months. That he received less than half the bottom of his guidelines range after receiving an enhancement for obstruction of justice would constitute a grave sentencing disparity if Mr. Macaulay were to receive close to his guidelines range.

Mr. Gilcher pleaded guilty pursuant to a favorable agreement that included a reduction to a 14-level loss enhancement and a two-level enhancement for deriving more than $1 million in gross receipts. Government's Position on Sentencing (Gilcher) at 4-6. He received a sentence of 12 months and one day.

Mr. Macaulay submits that his case can be fairly compared to that of Michael Gilchrist, and that Raymond Rahbar's is fairly compared to that of Bennie Magee.

Gilchrist and Mr. Macaulay both participated in fraud schemes devised by another. Their total loss amounts are roughly similar, both receiving a 14-level enhancement for total loss, if the Court agrees with Mr. Macaulay's analysis and argument above. Two key points distinguish the cases from one another, which Mr. Macaulay submits properly offset to resolve at a similar sentence.

Mr. Gilchrist pleaded guilty pursuant to a plea agreement and cooperated against Mr. Magee, earning him a reduction from 30-37 months under his guidelines to a final sentence of 12 months and a day. Of course, as part of the plea agreement, Mr. Gilchrist's overall culpability was reduced from what could have been proven had the case gone to trial or what he would have received had he pleaded to the indictment as Mr. Macaulay has done.

Unlike Mr. Gilchrist, however, Mr. Macaulay obtained loans for a legitimate business that used substantial portions of the loans for payroll and other authorized expenses. Mr. Gilchrist, on the other hand, used the PPP loan funds to invest in cryptocurrency and to fund personal expenses. Mr. Macaulay respectfully submits that these distinctions and similarities between his case and that of Mr. Gilchrist are the closest approximation of a non-disparate sentence among recent Eastern District of Virginia PPP loan fraud cases. Accordingly, Mr. Macaulay seeks a sentence of 12 months and a day as Mr. Gilchrist received.

*United States v. Sadie Mitchell*, E.D. Va. Richmond, Case No. 3:22-CR-44

The Government in its Position on Sentencing (ECF 125) compares Mr. Macaulay's case to that of Ms. Mitchell and argues he should receive a sentence in line with her 70 months. The two cases are superficially similar at best. Ms. Mitchell, while employed at the Virginia Motor Vehicle Dealer Board, used her access to a government database containing personal identifying information of Virginia residents to obtain over $1.2 million for herself by submitting false and misleading unemployment applications, Small Business Administration ("SBA") loans, PPP loans, and Economic Injury Disaster Loans. Government Position on Sentencing (Mitchell) at 1-2.

Further, Ms. Mitchell has criminal history category of III based on numerous prior convictions. *Id.* at 5. Ms. Mitchell's loss amount was $1.8 million based on her intended loss amount, which was greater than her actual loss amount of $1.2 million. She received a two-level enhancement for abusing a position of trust and another two-level enhancement because her offense involved 10 or more victims.

Sentencing Mr. Macaulay using Ms. Mitchell as a comparable example would result in an unwarranted sentencing disparity.

### Raymond Rahbar and Carl Pierre

Carl Pierre is the individual most closely comparable to Mr. Macaulay for purposes of avoiding unwarranted sentencing disparity. They worked together in the same business, both as executives and co-founders brought in by Raymond Rahbar.

Neither devised the fraud scheme but both participated similarly. Each involved a family member—Pierre his brother and his wife, and Macaulay his wife—though no family member of either was ever involved in the criminal conduct. Both signed fraudulent documents and inflated employee numbers at Rahbar's request. Both received funds from the PPP loans.

Pierre and Mr. Macaulay's cases are only distinguishable because Mr. Pierre cooperated with the government and entered into a plea agreement, whereas Mr. Macaulay pleaded guilty without a plea agreement. But obviously this distinction is substantial for purposes of sentencing. Nevertheless, Mr. Pierre received a sentence of one day incarceration. Mr. Macaulay submits that 12 months more is sufficient, but not greater than necessary, to address the disparity for Mr. Pierre's plea agreement.

Mr. Macaulay submits that the cases outlined above, as well as all other cases reviewed by the defense but left out of this Memorandum for space limitations, support his requested sentence of 12 months and one day. Any greater sentence would create unwarranted sentencing disparity and would be contrary to 18 U.S.C. § 3553(a).

Additionally, Mr. Macaulay respectfully requests that he be permitted to report to the Bureau of Prisons after January 1, 2026, to permit him to continue caring for his mother who is recovering from cardiac surgery and for whom Mr.

Macaulay is her only caregiver. The Government has indicated to undersigned counsel that they do not object to a late report. Mr. Macaulay respectfully requests that he be recommended for placement at FCI Fairton to serve any custodial sentence.

Ryan Macaulay will stand before this Court for sentencing humbled and ashamed for his actions, but hopeful and confident in his ability to learn from his experience. Mr. Macaulay is anchored by his faith that he will go on to be a loving father, son, and brother, despite his shortcomings. and to find solace in recognizing the errors of his ways and the courage to move through this phase of his life to a future informed by humility and purpose.

For the reasons stated above and that may arise at the sentencing hearing in this matter, Mr. Macaulay respectfully requests that this Honorable Court sentence him to a period of 12 months and one day incarceration.

Respectfully submitted,

RYAN MACAULAY,
By Counsel

/s/ Daniel H. Goldman
Daniel H. Goldman
VA Bar 82144
The Law Office of Daniel Goldman
421 King Street, Suite 505
Alexandria, Virginia 22314

Telephone: (202) 677-5709
Facsimile: (833) 523-2310
dan@dangoldmanlaw.com

*Counsel for Ryan Macaulay*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of August 2025, I electronically filed a true

copy of the foregoing Memorandum with the Clerk of Court using the CM/ECF

system, which will send notifications of such filing to all parties.

/s/ Daniel H. Goldman
Daniel H. Goldman
VA Bar 82144
The Law Office of Daniel Goldman
421 King Street, Suite 505
Alexandria, Virginia 22314
Telephone: (202) 677-5709
Facsimile: (833) 523-2310
dan@dangoldmanlaw.com